J-S18010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.S. | : | No. 97 MDA 2022 |

Appeal from the Order Entered December 16, 2021
In the Court of Common Pleas of Lycoming County Civil Division at
No(s):  12-21,583

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: AUGUST 23, 2022**

J.W. ("Father") appeals from the trial court's December 16, 2021 order that, *inter alia*, awarded B.S. ("Mother") and Father shared legal custody of their four children: H.W. (born in March of 2012), A.W. (born in March of 2013), M.W. (born in April of 2015), and J.W. (born in July of 2016) (collectively "Children").  The order further directed that Father and Mother shall share physical custody of A.W., M.W., and J.W., on a week-on/week-off basis, and that Mother shall have sole physical custody of H.W. until such time as his counselor evaluates his behavioral health and issues a report recommending a time schedule and steps for restarting Father's custodial time with H.W.  After careful review, we vacate and remand.

By way of background, Mother and Father were never married and it is unclear, based on our review of the record, when their romantic relationship ended.  Prior to the trial court's December 16, 2021 order, Father and Mother

shared physical custody of M.W. and J.W. on a week-on/week-off basis, Mother had sole physical custody of H.W., and Father had primary physical custody of A.W., with A.W.'s spending every other weekend with Mother. N.T., 12/7/21, at 27. At the time of the custody trial, Father sought primary physical custody of Children, with Mother's having custody of them every other weekend. *See id.* at 38-39; Father's Brief at 5.

The custody trial took place on December 7, 2021, where Father was represented by counsel and Mother proceeded pro se. There, Father called Britney Spangler, an assessment caseworker with Lycoming County Children and Youth, to testify. N.T., 12/7/21, at 4. She explained that she had two involvements with the family in October of 2021. *Id.* In the first involvement, Ms. Spangler investigated an allegation of physical abuse against Father with respect to J.W. *Id.* at 5. Ms. Spangler said that Father was "very cooperative[,]" and — after interviewing J.W. in private — Ms. Spangler determined that the allegation was unfounded. *Id.*

In her second involvement with the family, Ms. Spangler recounted that she "was called in for substance abuse concerns for Mother, inappropriate discipline at Mother's home[,] and inadequate nurturing and affection and that allegation was involving Mother's boyfriend, [T.K.]" *Id.* Ms. Spangler recalled that:

> [I]t was difficult to get in contact with Mother, I was not able to contact her by phone multiple times. When I did arrive at her home on November 4th, [2021,] I explained who I was and I explained the allegations. She demanded that I tell her what date

[they occurred,] and I told her [that] I was not able to disclose that due to confidentiality reasons.

Mother then stepped out on[to] the porch and got in my face and became very hostile. She had requested that I contact police to assist me so I told her not to leave and I would do so. I did walk away from the home just for my own safety and the safety of my coworker that was with me.

We contacted Williamsport Police. … [T]hey arrived like 20 minutes later and we returned to the home[,] and Mother had left the house with the children and I wasn't able to gain access.

And then on the 10th of November [of 2021,] I contacted Father and explained … [that] I was over my deadline and I really needed to see the kids even though he wasn't listed as a party and only as a parent[,] but Father was very welcoming, told me, absolutely, come up and see all the kids. I went up but my victim child was [H.W.,] and he was not at Father's house. But when I observed the kids, the other children at Father's house, the home was clean, was appropriate, and Father had, like, a two[-]hour notice that I was coming but the home was clean, it was appropriate, he was very welcoming, very inviting into the home.

After I left Father's home[,] I then went and contacted a male caseworker from our Crisis Unit and he assisted me at Mother's home. It took a lot of convincing for Mother to allow both me and my coworker … into the home. Once we did gain access, [Mother's boyfriend, T.K.,] was on the phone and he was screaming that I don't have the right to interview [H.W.] one-on-one. I was explaining that that's my role and my job is just to make sure that the kids are safe.

So[,] eventually[,] I was able to speak to [H.W.] upstairs alone in the bedroom. And in the bedroom, they are all sleeping in the one master bedroom. There are two toddler beds and a mattress that [J.W.] – let me say it this way, everyone but [A.W.] sleeps in there including Mother and Mother's paramour. There was also alcohol found around the bed['s] side. There was some clutter in the home as well. [A.W.] sleeps in a separate bedroom[,] which [H.W.] was able to show me[,] which was deemed appropriate.

I asked Mother if she needed any assistance with cleaning out the other bedroom, getting beds for the kids, getting anything like that, and she told me, no, she didn't need anything from [Children and Youth Services ("CYS")]. And I told her this can't be a

- 3 -

permanent thing, it has to be a temporary setting, the sleeping conditions, but … it wasn't unsafe, just borderline marginally appropriate. So I did make that allegation valid.

[H.W.] does have some behavioral problems [and] … he's been recommended for a psychological [evaluation,] which Mother had not followed through with…. [H.W.] … reports to me that he does have a lot of anger and sometimes he just doesn't know how to express himself. … [T]hroughout CYS involvement, Mother has always been provided with the knowledge and resources to help [H.W.] with his behaviors and Mother has not followed through on any of them.

*Id.* at 6-8. When asked if she thinks H.W. suffers because of Mother's failure to secure psychological assistance for him, Ms. Spangler responded:

I do. [H.W.] portrays his Father as this person who drinks and, you know, beats him. And I said, [H.W.], that's not what's happening … with your other siblings and things like that. So he seems to have this different perception and I'm not sure that he came to that conclusion on his own.

So some assistance and some individualized services for [H.W.,] I think would be extremely beneficial for his well[-]being.

*Id.* at 8-9. Further, when asked if she has any concerns for Children if they are with Father, Ms. Spangler answered no. *Id.* at 9. However, when asked the same question with respect to Mother, Ms. Spangler indicated that she is concerned with "the lack of services and the lack of follow[-]through with Mother, her hostility with service providers that are just there to help…. And obviously, the sleeping arrangement would be a concern, again, not unsafe but marginally appropriate." *Id.*

Paternal grandmother, D.P.C. ("Paternal Grandmother"), testified next. Aside from Children, she stated that Father resides with her, along with Father's fiancé, A.E., and their child, N.W. *Id.* at 11, 13. When Children are

in Father's care, Paternal Grandmother says that she helps Father care for them. *Id.* at 11-12. She described that "Father and [A.E.] both do homework with [Children], they read to them, [and] they sit and play games with them. The interaction is a really family[-]oriented situation. … They prepare the meals. We always have a sit[-]down[-]at[-]the[-]table meal." *Id.* at 12. Paternal Grandmother also explained that, at her house, she has a bedroom, N.W. has a bedroom, J.W. has a bedroom, Father and his fiancé have a bedroom, A.W. has a bedroom, and M.W. and H.W. share a bedroom. *Id.* at 13-14.

Erika Bischoff, a trauma therapist at Crossroads Counseling, was called to testify next. She explained that H.W. and A.W. were referred to her by the Guardian *Ad Litem* ("GAL") and Father in September of 2021. *Id.* at 17-18. Ms. Bischoff relayed that Mother was responsible for setting up appointments for H.W., and that while Mother was cooperative, Ms. Bischoff "didn't always get a response when I needed it to schedule[,]" and therefore, there were lapses between H.W.'s appointments. *See id.* at 18-19. Though therapy sessions typically are supposed to occur once a week, Ms. Bischoff stated that she has seen H.W. five times since September 2021. *Id.* at 18. In comparison, Ms. Bischoff said that Father sets up appointments for A.W., and Ms. Bischoff has "seen [A.W.] every week … since we started." *Id.* at 20. Ms. Bischoff conveyed that A.W. is "doing well in school, she's doing well socially, [and] she enjoys her gymnastics[,]" but Ms. Bischoff noted that A.W. has expressed "some anxiety related to how she feels at [Mother's] house, [and]

her interactions with [H.W]. [H.W.] seems to be very aggressive, both verbally and physically, to her and the other siblings in the home. And she has a lot of difficulty sleeping there or she reports that she does." *Id.* When asked about any concerns she has regarding H.W., Ms. Bischoff stated that she "need[s] to build some more engagement with him and kind of establish a relationship to really get to know him a little bit better. When he was in[-]person at our office, he was pretty verbally aggressive and pretty wound[-]up with his responses…." *Id.* at 21.

Next, Father's fiancé, A.E., testified. She confirmed that she lives with Father, and that they have a three-year-old child together, N.W. *Id.* at 22-23. A.E. relayed that she helps care for Children when they are in Father's custody, and that she has a good relationship with them. *Id.* at 23. A.E. also noted that Children have bonded with N.W. *Id.* at 24. On cross-examination, Mother accused A.E. of "putting [her] hands on" Children, which A.E. denied doing. *Id.* at 24. Later, on redirect examination, A.E. recalled a custody exchange where Mother allegedly attacked her, shoving A.E. to the ground and spitting in her face. *Id.* at 25-26.

Father testified after A.E. He estimated that he has not seen H.W. since March or April of 2021. *Id.* at 27. He recounted that H.W. had alleged that Father had beat him, though subsequent Protection From Abuse ("PFA") proceedings against Father were dismissed and CYS found that the allegations were unfounded. *See id.* at 29, 45. Since the PFA was dismissed, Father said he has tried multiple times to speak to H.W., but Mother would not let Father

- 6 -

speak to H.W. and instead told Father to not "ask me about my son, leave me alone about my son, you're a child beater, you're a piece of crap." *Id.* at 29. Father remembered that Mother once sent him a video from H.W., in which H.W. said he does not like Father and wants nothing to do with him. *Id.* Father represented that he is willing to engage in therapy with H.W., and that it is his goal to restore the relationship with him. *Id.* at 28.

Father says that Mother harasses Father out of the blue and has made death threats against him, such as "I can't wait until your last breath. I will shit and piss on your grave. If the judge would ask me if I want you dead[,] I would tell him yes." *Id.* at 30. Father corroborated that Mother attacked A.E. and him at a custody exchange when Children were present, and indicated that Mother causes a scene at many of the custody exchanges. *Id.* at 30-31. When Mother attacked Father and A.E. at the one custody exchange, Father recalled that Children "were screaming, they were upset, … they didn't know what was going on." *Id.* at 31.

With respect to A.W., who Father had primary physical custody of at the time of trial, Father said she is doing great, has missed minimal school in his care, and has developed a routine in the year that he has had her. *Id.* at 31-33. Regarding J.W. and M.W., Father stated that he ensures that they go to bed early and arrive at school on time during his periods of custody. *Id.* at 33-34. According to Father, during Mother's periods of custody, Children "are not in school, they are not present. If they are there, they are late because I get phone calls constantly saying that your child is absent. … Their homework,

their backpacks are always overflowing with work [from the] previous week." *Id.* at 34. Father also testified that he recently learned from the GAL that Mother withdrew H.W. from public school without consulting him. *Id.* at 35.

With respect to medical appointments for Children, Father represented that Mother will make appointments for them during Father's custodial time and will not mention the appointments to Father until the last minute. *Id.* at 36-37. Father also complained that Children do not brush their teeth when they are in Mother's care. *Id.* at 37-38.

On cross-examination, when asked why H.W. would tell Mother that Father is abusing him, Father said that he thinks H.W. is "being coached." *Id.* at 44. Father also denied abusing H.W. *Id.*

The next witness to testify was Rebecca Grove, J.W.'s kindergarten teacher. Ms. Grove testified that, in the first quarter of the school year, J.W. "was absent a lot more than I'd like to see." *Id.* at 49. Ms. Grove related that, during the weeks J.W. was with Mother, J.W. was tardy frequently or absent, and on the weeks that J.W. was with Father, J.W. was at school on time. *Id.*

The GAL, Angela Lovecchio, was called as the next witness. She stated that she has been working with the parties since August of 2021. *Id.* at 51. The GAL testified that her interaction and involvement with Father has been very good. *Id.* The GAL recounted meeting with H.W. and stated that she found his allegations that Father had hit him to be incredible. *Id.* at 52-54.

The GAL opined that Mother is trying to drive a wedge between H.W. and

Father, recalling:

> [Mother] took a video of [H.W.] where [H.W.] is saying, look, I don't want to see you, [Father], I don't like you so just leave it alone, or something like that. And I thought … for [Mother] to send that to [Father], I just thought that was not appropriate. I thought that was feeding into – he's – how old is he, like, nine or ten? He was born [in] 2012[,] so he's 11, am I right? I don't know.[1] Anyway[,] he's in fourth grade so I felt like it wasn't appropriate for her to do that, … to make a video and send it to [Father]. … [T]hat's not the relationship that should occur [between a mother and a son].
>
> And also when I would go and talk, [Mother's boyfriend, T.K.,] would be there and [T.K.] … was full into it that [H.W.] was beaten by Father and … they were just dead set against [Father]. So[,] as I kept going to see [Mother], … I said there's something terribly wrong here because she's not trying to re-engage [Father] and [H.W.], which I think [H.W.] needs. [H.W.] needs to know that his Father loves him, that's the only way this relationship is going to work.
>
> And H.W. … swears, he gives the middle finger. I mean, while I was there…[,] [M.W.] said[,] "He's giving me the middle finger right now. He's giving me the middle finger." And I've spoken with [A.W.], [A.W.] told me that's what happens a lot and [Mother] does not redirect them. She doesn't apparently do anything.

*Id.* at 54-55.

The GAL also discussed the counseling received by H.W. and A.W., as

follows:

> [Father's counsel:] Now [H.W.] was supposed to be involved with counseling[, as] we heard from the counselor?

_____

[1] At the time of the custody trial in December of 2021, H.W. was, in fact, nine years old. *See* Order, 12/16/21, at 2 (setting forth that H.W. was born in March of 2012).

[The GAL:] … [A psychologist did] an evaluation on [H.W.] and it was June 29th of 2021. And … really[,] the only important part here is that [the psychologist] recommend[ed] that [H.W.] be provided with outpatient counseling, that counseling should include both individual time for [H.W.] with his therapist and time for the therapist to meet with the parents. Hopefully[,] the therapist can assist in the process of helping [H.W.] feel better about visiting with … [F]ather.

Okay. And even [the psychologist] says it is to … Mother's credit that she wants [H.W.] to resume having a good relationship with … Father and seemed willing to facilitate that process. But, then when I … said … we need to get a therapist involved and I thought of Erika Bischoff right away because she is wonderful with children…. So I tried to get that instituted immediately and it was difficult because [H.W.] would only meet with her[,] or [Mother] would only allow [H.W.] to meet with her[,] while [Mother] was there. [Mother] was either off in the same room or she was there. She … wouldn't allow or [H.W.] was not alone with [Ms. Bischoff] [*sic*] and … that was a problem. That was a real problem. There was such enmeshment. So I just felt like, first of all, you have this … report by [the psychologist,] saying you need to get therapy, and nope, and [Mother] had [H.W.], so there was no therapy at all until I pushed [Ms. Bischoff], and I pushed it.

I went to [Mother's] house, … I asked her to call [Ms. Bischoff] and she set up the time for [H.W.] to meet with her, same for [Father], because we thought it would be good for [H.W.] and [A.W.] to meet with [Ms. Bischoff], not so much the littles ones yet….

[Father's counsel:] In listening to … [Ms.] Bischoff's testimony, [Father] seemed to be compliant with everything?

[The GAL:] He was very compliant. I mean, I had gone to one of the therapy sessions and I was there with [A.W.], [Father] was not in the room and … we just talked and it was fine. And then I went downstairs and I spoke with [Father] alone while [A.W.] was upstairs with [Ms. Bischoff]. And it was at that point that … [Father] shed some tears that it was hard to take. I mean, the text messages [sent to Father from Mother] are relentless, they are horrific, they are venomous. I don't think I've ever seen them. I don't think I've ever seen them in a case. It didn't matter who was on the text. There was a group text with [Ms.] Bischoff,

myself, [Mother] and [Father,] and even in those[, Mother] just let it loose.

[Father's counsel:] And [Mother] was less consistent with taking [H.W.] to the counseling sessions?

[The GAL:] Oh, absolutely. There were times where [Ms. Bischoff] couldn't get a hold of them or they would cancel and she was having a really difficult[] time. She just wanted to speak with [H.W.] alone.

[Father's counsel:] And you believe that's detrimental to [H.W.]?

[The GAL:] … [Y]es, I think he needs … counseling. I think he needs … Father. I think that's a lot of the problem here, the anger.

*Id.* at 55-58.

With respect to H.W.'s schooling, the GAL recalled:

[Father's counsel:] We learned that [Mother] withdrew [H.W.] from the public school setting, correct?

[The GAL:] So I went up to the school again, I wanted to meet with [H.W]. I went and found out he was not there…[. T]here was actually a meeting at that point [with] … school [o]utreach, … CYS and I can't remember who, it was somebody else from the school…[. T]hey talked on the phone with [Mother,] and I was there[,] … to tell her that … [H.W.] could not keep missing school, that she would eventually have to have a doctor's excuse for him every time because [H.W.] … was having a hard time going to school. They would have these episodes out front where [H.W.] would scream and like hold onto [Mother's] car for 45 minutes[,] and [Mother's boyfriend (T.K.) w]ould be there and pick [H.W.] up and bring him into the school.

And there was one time … [H.W.] kicked [a school employee] right in the groin. [H.W.] was just inconsolable and did not want to go into the school[,] and I could never really find out why. I know one time … [Mother] went into the school, … she wanted [Father's] name removed from everything[,] and … the secretary, I believe, must have told her no and [Mother] called them bitches and [a school employee] came and said you [have] got to go. So it was right around that time[, Mother] just withdrew [H.W.] from school on her own and put [him] in a cyber school.

And I … was kind of stunned by that and I told [a school employee], I sent him a copy of the [c]ourt [o]rder that shows they have shared legal custody so I don't know how the school allowed it.

[Father's counsel:] Based off your knowledge of [H.W.] and your interactions with him, do you think he's going to thrive well in cyber school under [Mother's] care?

[The GAL:] No. He is in fourth grade, he needs to go to school, and if there's a problem[,] it needs to be addressed why he doesn't want to go to school. Is it because … he's being fed this line that[,] if he goes[,] his Father's going to be there and he's going to get him? … [I]t's incomprehensible to me. He should be going to school.

*Id.* at 58-59.

The GAL stated that A.W. is doing great residing primarily with Father. *Id.* at 59. When told that Mother wants to have A.W. half of the time and asked if A.W. would do well in that situation, the GAL said that her "recommendation is that the kids live primarily with [Father] until [Mother] addresses whatever mental health issues she has because [Mother] hates [Father]." *Id.* at 60. The GAL said she does not know how "you would ever be able to coparent when you hate like that. Because eventually the kids know. The kids see it. They see it, it's obvious." *Id.* The GAL also expressed fears that, with H.W. going to cyber school, the other Children will want to stay home and go to cyber school. *Id.* The GAL additionally noted that A.W. told her that Mother was moving, and the GAL did not know where Mother was going to be living. *Id.* at 61.

Ultimately, the GAL recommended that Father have primary physical custody of Children. *Id.* at 62. The GAL said this arrangement was in Children's best interests because:

Father … has structure, … every night they come home, it's a calm environment, … there's not chaos except kid chaos. … [H]e checks their backpacks. They have dinner together, I've just popped in at that time and I've seen that. … [T]he kids go to school every day.

*Id.*

Mother then called her boyfriend, T.K., to testify. T.K. testified that H.W. has told him that Father has punched him in the back, called him names, and failed to feed him at night. *Id.* at 65. T.K. said that, while Mother and T.K. have tried to encourage H.W. to talk to Father, H.W. has refused. *Id.* at 66. According to T.K., H.W. has come to him on multiple occasions and indicated that he "wishes [Father] would die and he wishes he could kill his [Father]. And he told me multiple times that he wanted to commit suicide because he doesn't want to be around, he's afraid to go back to his [Father's]." *Id.* at 68. However, T.K. indicated that he has "seen an amazing difference in H.W." since he has been enrolled in cyber school at home. *Id.* at 67.

On cross-examination, T.K. conveyed that he was with Mother at the custody exchange when she purportedly attacked Father and his fiancé, but T.K. denied that Mother attacked anyone. *Id.* at 73, 77. Further, when asked what actions he and Mother have taken to address H.W.'s suicidal issues, T.K. responded that "[w]e've tried to take him to the hospital. We tried to get him help. We took him to mental health. They keep basically telling us there's

- 13 -

nothing they can do until he harms himself." *Id.* at 74. T.K. also confirmed that he and Mother are moving; Mother is relocating to her mother's house and T.K. is moving closer to his work. *Id.* at 76.

In addition, T.K. admitted that he and Mother have gotten into verbal altercations and, during one argument, Mother smashed a truck window while H.W. was present. *Id.* at 116-19. Further, after an argument, T.K. recalled telling Father out of anger that Mother should not have custody of Children. *Id.* at 115-16.

Mother next called family friend, Fran Hort, to testify. Ms. Hort testified that H.W. has told her on multiple occasions that he is very afraid of Father and that Father beats him. *Id.* at 83. According to Ms. Hort, H.W. has said that he wishes he was dead because he is afraid of Father and also expressed the desire to kill Father. *Id.* Ms. Hort acknowledged that none of the other Children have made similar claims that they have been abused by Father. *Id.* at 83-84.

Maternal grandmother, P.L. ("Maternal Grandmother"), testified after Ms. Hort. Maternal Grandmother testified that H.W. has indicated that Father hits him and calls him names, and that H.W. is scared to be around Father. *Id.* at 85.

Following Maternal Grandmother, maternal grandfather — S.L. ("Maternal Grandfather") — was called as the next witness. Maternal Grandfather said H.W. has told him numerous times about being pushed, smacked, and man-handled by Father, and that he would sooner die than go

back to Father.  *Id.* at 86.  Maternal Grandfather testified that M.W. has also had a few reactions where he did not want to go back with Father.  *Id.* at 88. Further, Maternal Grandfather described that Mother and Father "are like oil and water," and cannot "get along for anything."  *Id.*

Following Maternal Grandfather, Mother testified.  She said, in May of 2021, H.W. told her about being verbally abused by Father, and then shortly after that, she noticed bruises down his back and legs.  *Id.* at 91, 94.  She stated that she then took H.W. to the hospital, and the hospital indicated it was child abuse and reported it to the child abuse hotline.  *Id.* at 91.

Mother also described that H.W. has been "soaring" since he has been in cyber school, and that she has seen a "huge turn around" in him.  *Id.* at 92.  She said that she took him out of public school "due to him being bullied and also being mistreated by school staff."  *Id.* at 91-92.  Mother went on to detail that she has been taking H.W. to see a psychiatrist, who has put him on medicine for anxiety and depression.  *Id.*  However, she shared that H.W. still has nightmares about Father, and that he is afraid of Father.  *Id.* at 92.

In addition, Mother confirmed that she is moving in temporarily with her parents, but noted Children will remain in the same school district.  *Id.* at 97-100.  At her parents' house, Mother says she and the girls will share a bedroom, and the boys will share their own room.  *Id.* at 97-98.  Mother also testified that she recently obtained a new job, but suggested that Maternal Grandmother and Maternal Grandfather would be able to watch Children.  *Id.* at 99-100.

On cross-examination, Mother explained that Children are late to school because she has to deal with H.W.'s throwing fits in the morning. *Id.* at 100. Mother also acknowledged that CYS determined that Father had not abused H.W. *Id.* at 102-03. Nevertheless, she stated that she does not care what CYS found because she knows Father abused H.W. *Id.* at 102. Moreover, though Mother recognized that she and Father share legal custody of Children, she admitted that she did not tell Father that H.W. was referred to a psychiatrist, was prescribed medicine, and withdrew from public school and enrolled in cyber school. *Id.* at 104-05. Regarding the video H.W. sent Father indicating that H.W. wants nothing to do with him, Mother said she told H.W. to send it to Father as proof that H.W. does not want to talk to him. *Id.* at 106. Mother also conveyed that she does not try to sit in on H.W.'s counseling sessions with Ms. Bischoff but claimed that H.W. "will not do anything without [her] present." *Id.*

Mother additionally admitted to sending Father certain text messages. In the messages, Mother said, among other things, that she and H.W. hope Father dies. *Id.* at 107-09.[2] Mother likewise conceded that she pushed

---

[2] One text message from Mother to Father stated:

> I treat you like shit because of how you are. I really do hope you fucking die. I hope you, your mom, [Father's fiancé, A.E.,] and [Father's stepdad,] Keith[,] die[,] that way I don't have to deal with any of you. My kids would be better off without any of you, you fat fuck, good for nothing but laying on your back.

*(Footnote Continued Next Page)*

- 16 -

Father's fiancé, A.E., at a custody exchange and tried to hit Father, but said it was because A.E. had a camera and was encroaching upon Mother's personal space in the midst of the COVID-19 pandemic, which made Mother feel threatened. *Id.* at 111-12. At that exchange, Mother also alleged that Father was "balling his fists up at me." *Id.* at 111. Mother, however, denied that every custody exchange has resulted in an argument. *Id.* at 110-11. Last, Mother complained that Father takes Children to see doctors too often, fails to fill her in on what is happening, and does not respond to her messages. *Id.* at 110, 113-14.

Next, Holly Erb — an assessment supervisor with Lycoming County Children and Youth — testified. She stated that she is currently investigating allegations made against Mother and T.K. pertaining to domestic violence and

_____

N.T., 12/7/21, at 108; *see also id.* at 97 (Mother's identifying Keith as Father's stepdad). Another text message from Mother to Father said:

> It's funny because [H.W.] wishes death on you everyday, that's his own words because I wonder why [*sic*]. Because you beat him and belittle him. He's such a sweet, handsome young man[,] no thanks to you. He's changed so much since he hasn't seen you or had to deal with you. If you died[,] he wouldn't be sad, neither would 80 percent of the rest of the world. You're a horrible F-ing person.

*Id.* at 108-09; *see also id.* at 109 (Mother's stating to Father, via text message, that "[y]ou think [you're] tough but you're not. You ain't shit. You think you have everyone on your side but you don't. If the [j]udge asked me if I wished death on you[,] I'm going to say yeah and I'm not the only one. And after everything you did to me and my son[,] you will not win"); *id.* at 110 (Mother's texting that "I hope you die a long painful death, bro. You're a stupid piece of shit and illiterate as fuck. … I hope you drop the fuck dead where you stand").

inappropriate discipline, and noted that it has been reported that Mother and T.K. are getting evicted. *Id.* at 124-26. Ms. Erb also discussed other allegations and matters concerning Mother and Father. *See id.* at 126-28.

Finally, the trial court interviewed Children. A.W. and M.W. indicated that they wish H.W. would come back to Father's house. *Id.* at 140, 154. Additionally, A.W., J.W., M.W., and H.W. all conveyed that Mother and T.K. fight. *See id.* at 137, 152-53, 164-65. In fact, M.W. stated that "[w]hen [Mother] fights with [T.K.,] I worry [Mother] is going to get hurt[,]" and J.W. shared that "[w]hen [Mother] fights[,] I cry." *Id.* at 153. J.W. also said she worries that Mother is going to go to jail. *Id.*

Following the custody trial, the trial court issued an order, in which it determined, *inter alia*, that Mother and Father shall share legal custody of Children, and physical custody of A.W., M.W., and J.W., on a week-on/week-off basis. *See* Order, 12/16/21, at 2. The trial court also directed that Mother shall have sole physical custody of H.W. until such time as his counselor evaluates his behavioral health and issues a report recommending a time schedule and steps for restarting Father's custodial time with H.W. *Id.* at 2, 3.

Thereafter, Father filed a timely notice of appeal, but failed to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), contemporaneously with his notice of appeal as required by Rule 1925(a)(2)(i). *See* Pa.R.A.P. 1925(a)(2)(i) ("In a children's fast track appeal … [t]he concise statement of errors complained of on appeal shall be filed and

served with the notice of appeal."). On January 25, 2022, the trial court directed Father to file a concise statement within 21 days, *i.e.*, no later than February 15, 2022. Problematically, the original trial court docket did not reflect that Father filed a concise statement in accordance with the trial court's order. Consequently, this Court issued a rule to show cause as to why Father's appeal should not be dismissed for waiver of all issues due to his failure to file a concise statement. Father filed a response, along with a time-stamped copy of his concise statement, demonstrating that he had timely filed his concise statement on February 11, 2022. This Court then ordered the trial court to amend the trial court docket to reflect that Father had filed his concise statement on February 11, 2022, and we discharged the rule to show cause. The trial court issued a Rule 1925(a) opinion on February 17, 2022.

Presently, Father raises one issue for our review:

Whether the court improperly weighed the custody factors in reaching its decision.

Father's Brief at 4 (unnecessary capitalization omitted).

At the outset, we address whether Father's failure to file his Rule 1925(b) concise statement with his notice of appeal, as required by Rule 1925(a)(2)(i), results in waiver of his issue. We determine it does not. In *In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009), we ascertained that, where the party's failure to strictly comply with Rule 1925(a)(2)(i) does not prejudice the other parties in the case, we need not quash or dismiss the appeal. *Id.* at 748. *See also C.M. v. M.M.*, 215 A.3d 588, 590 n.5 (Pa. Super. 2019)

(similar); ***R.S. v. T.T.***, 113 A.3d 1254, 1256 n.1 (Pa. Super. 2015) (similar).

Here, Mother has not alleged that she has suffered any prejudice due to

Father's violation of Rule 1925(a)(2)(i).[3]    Accordingly, we proceed to the

merits of Father's appeal.

We apply the following scope and standard of review to Father's issue:

> The appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it….   However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination….   Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

Moreover,

> On issues of credibility and weight of the evidence, we defer to the findings of the trial court who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence.   Rather, the paramount concern of the trial court is the best interest of the child.   Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

> The test is whether the evidence of record supports the trial court's conclusions.

***C.M.***, 215 A.3d at 591 (cleaned up).

_____

[3] Mother has not filed an appellate brief.

- 20 -

It is well-established that "[t]he primary focus in any custody case is the best interests of the child. The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." *Id.* (cleaned up). Further, "trial courts are required to consider all of the factors listed in [23 Pa.C.S. §] 5328(a) … when entering a custody order." *Id.* (cleaned up). Section 5328(a) provides:

**(a) Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Here, the trial court considered the Section 5328(a) factors as follows:

[The f]irst factor that is considered is which party is more likely to encourage and permit frequent and continuing contact between the child and another party. In regards to Mother, she is openly hostile to Father and this is also in front of … [C]hildren and everyone, I guess the general public even. [Mother] does not seem to care about the [e]ffect this has on … [C]hildren and she has not made it easy for … Father to see … [C]hildren. In regards to Father, [Mother's] complaint is Father is slow to respond to Mother on matters[;] however[,] there is no indication that Father inhibits or interferes with [Mother's] contact with … [C]hildren. This factor favors … Father.

[The n]ext factor[] [is] the present and past abuse committed by either party or a member of the parties' household, [and] whether there is a continued risk of harm to the children or an abused party. In regards to Mother[,] there [are] no reports of [Mother] abusing … [C]hildren[;] concerns are with her housing and with verbal altercations with her paramour, [T.K.] Some instances have been out of control. The incident regarding the truck window is one of those examples. Regardless of who owns the truck, if someone's breaking out a window out of an argument, things are getting out of control. In regards to Father, [Mother] made a vague allegation regarding Father and Mother when they were together, however[,] nothing specific was given, no evidence that Father was physical with Mother, and the allegations in regards to Father and [H.W.] have not been substantiated. And [in] regards to their interactions currently, Mother has been the aggressor towards Father during the exchanges. This factor does not favor either party.

The parental duties performed by each party on behalf of the child. The [c]ourt believes that both parties are able and have met the needs of … [C]hildren. It does seem from the information provided to the [c]ourt[,] through text messages provided by both Mother and Father[,] that Mother has a more hands[-]off approach in believing … [C]hildren should be somewhat more responsible even though they are [of a very] young age. I do not find that particular factor to be informative or to favor either party.

The need for stability and continuity in the child's education, family life and community life. [Mother's] life is somewhat chaotic. … [C]hildren perceive the tension that exists between [Mother] and her paramour. They express concern for Mother. They express th[e] concern that either [Mother] would be hurt or [Mother] would end up in jail. I believe this is a sincere thought from them, whether it's accurate or not is somewhat irrelevant, it's what they perceive because they have … concerns for Mother, they care for her. … [T]hey reflect [that] they feel instability in her house. There's also concerns with [Mother's] housing[,] that it was insufficient based on space needs. I know Mother is relocating and that creates a little bit of a question mark as to what the housing will be for … [C]hildren going forward. In regards to Father's household, it appears to be stable, more routine, [and] less chaotic. This factor does favor Father.

The availability of the extended family. Both parents have family support locally[,] and both of them have good relationships with … [C]hildren[,] so this factor does not favor either party.

The child's sibling[] relationships. … [C]hildren all expressed a desire to be around each other and care for each other. This supports that this [o]rder should bring … [C]hildren together and have them spend more time together. This does not necessarily favor either party.

[The n]ext factor[] [is] the well[-]reasoned preference of the children based on the children's maturity and judgment. Speaking with … [C]hildren helped me better understand them, their connection to each other, [and] their connections to Mother and Father. However[,] they are too immature to provide a well[-]reasoned preference for Mother or Father[,] so this [factor] … does not favor either party.

The attempts of a parent to turn the child against the other parent. [Mother] is openly hostile towards Father, [and] this has negatively impacted … [C]hildren's view of Father. In regards to Father, there's no indication that … [C]hildren have a bad impression of [Mother] and that Father created a bad impression. … [C]hildren simply express concern for Mother, not a dislike for Mother. This factor does favor Father.

Which party is more likely to maintain a loving, stable, consistent, nurturing relationship with the children[,] adequate for the children's emotional needs. … [C]hildren are attached to both Mother and Father[,] with a[n] exception of the issues right now with [H.W.,] I'll address that later though. There [are] concerns with stability with Mother's household, the obvious conflict between [Mother's paramour (T.K.)] and Mother[,] as … [C]hildren recognize it. The testimony by both Mother and [T.K.] supports that. This factor does slightly favor … Father.

Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the children. Mother has a more laid[-]back approach and indicates that she feels … [C]hildren are capable or should be more responsible for their own follow[-]through on matters with less oversight. … [C]hildren are very young and that does … give me a little concern. Father is more attentive to the needs to prompt and oversee … [C]hildren because of their age. This factor does slightly favor Father. The proximity of the residences of the parties is the next factor[, which] is not relevant in this matter.

The parties are close enough together that this does not play a major impact and does not favor either party.

Each parties' availability to care for the child or ability to make appropriate child care arrangements. I believe each of them are capable of caring for … [C]hildren themselves and also have adequate support from family to meet these needs so I do not find this factor to favor either party.

The next factor, the level of conflict between the parties and the willingness to cooperate with one another. This is a recurring theme. Mom is belligerent towards Father, her own exhibit indicates her behavior is harassing, demeaning and immature towards Father, [and] this is based upon what Mother asked me to review. There's no evidence from those documents or any others that Father … does reciprocate[;] he is not the source of the current conflict. Regardless of what may have occurred when the parties were together, Father is not the current source of conflict. Mother, it's very apparent, is that source. This factor does favor Father.

Next factor, the history of drug and alcohol abuse of a party or member of a parties' household. No claims were made regarding either party concerning alcohol or drug use, there was nothing substantiated or put forth to question either party on this so the [c]ourt does not find this to favor either party.

The next factor[:] the mental and physical condition of a party or a member of a parties' household. [Mother's] behavior raises some major concern with the [c]ourt that there's something going on here that's undiagnosed and should be addressed. Nothing … similar has been raised for Father. The [c]ourt does find this issue to slightly favor Father at this time.

Then[,] there's a category under other relevant factors and probably one of the major issues in this case is [H.W.'s] mental health and behaviors. It is apparent to the [c]ourt[,] through what's been testified to and my interactions with [H.W.], [that] he needs professional help. He needs more than what he's getting now[,] and it's important that the parents, and in particular Mother, stays out of the way and allows the professionals to assist him.

Based on all these factors, the majority of the factors favor Father[,] and Mother's behavior towards Father is detrimental to … [C]hildren. The [c]ourt is concerned that if Mother does not

change her behavior[,] that … [C]hildren will be negatively impacted. However, … [C]hildren are bonded to Mother[,] and there is value in giving Mother an opportunity to correct the behaviors and maintain the bond. However, Mother's behaviors must change or she faces the possibility of losing significant time with her [C]hildren.

The [c]ourt is very concerned when it comes to [H.W.'s] mental health[,] and therefore[,] the [c]ourt is ordering that [H.W.] undergo a behavioral health evaluation with Dr. Denise Feger. Mother and Father shall not be present for the initial evaluation but shall participate in the evaluation process as directed by Dr. Feger. The [c]ourt is directing that either [M]aternal [G]randmother or [M]aternal [G]randfather will be the individual who transports [H.W.] for this evaluation. However, neither of them shall be present in the room during the evaluation and may remain at the property but shall not insist on being in the room when he's being evaluated.

Additionally, Mother shall undergo a similar evaluation by Dr. Feger. At the conclusion of the evaluations[,] Dr. Feger shall issue a report to this [c]ourt for the recommendation on the time schedule and steps for the restarting of Father's custodial time with [H.W]. Upon receipt of the report, [the c]ourt will schedule a conference for the purpose of the [c]ourt issuing a schedule for Father's custody time to be reinstated with [H.W].

Dr. Feger shall report to the [c]ourt if either Mother or Father shall fail to cooperate in scheduling or participating in the ordered evaluations. If a party interferes with the evaluation process, the [c]ourt may take action to adjust their custodial time including the reduction of that party's time with … [C]hildren.

It is the [c]ourt's intention to reinstate Father's custodial time with [H.W]. However[,] until Dr. Feger's report is submitted to the [c]ourt and the [c]ourt holds the conference, the parties shall share physical custody as follows:

They will have 50/50 custody of [A.W.], [M.W.,] and [J.W.,] with the exchanges taking place at the current time and location, either [M]aternal [G]randmother or [M]aternal [G]randfather shall conduct the exchanges on behalf of Mother. Mother and [T.K.] shall not be present during the exchanges. Mother shall have primary custody of [H.W.] until the report and conference are scheduled[,] and the [c]ourt has an opportunity to implement a

new schedule for [H.W.] The intention is for [H.W.] to resume to a 50/50 custody arrangement between the parents.

Mother and Father shall use the app known as APPCLOSE for all communication. It is expected the conversation will be solely limited to custody matters and … [C]hildren's well[-]being. Belittling, badmouthing of either parent[,] is not acceptable and will not be tolerate[d;] it will be grounds for contempt. If it continues onward[,] it will be grounds to subject modifications to your custody order. It needs to stop.

N.T., 12/10/21, at 2-10.

Further, in its written December 16, 2021 order, the trial court reiterated that,

[i]t is clear to the [c]ourt that Mother exhibits open hostility toward Father even in the presence of … [C]hildren, and this hostility has negatively impacted … [C]hildren. Mother states that her hatred for Father comes, in part, from Father's alleged abuse of [H.W.]. However, this abuse has never been substantiated. The [c]ourt is concerned that Mother may have an undiagnosed mental health condition and her behavior has been significantly detrimental to [H.W.], who is now in need of professional help. If Mother does not change her behavior, … [C]hildren may be further impacted and Mother risks losing significant custody time in the future if this occurs. However, … [C]hildren are bonded to Mother and there is value in giving Mother an opportunity to correct her behaviors and maintain those bonds.

Order, 12/16/21, at 1.

On appeal, Father argues that the trial court "entirely disregarded the factors." Father's Brief at 14. He says that the custody factors designed to determine the best interests of Children favored him, and that therefore, "the best interests of … [C]hildren would have been met by awarding Father primary custody of … [C]hildren." *Id.* at 15. Moreover, he complains that the trial court solely denied his request for primary physical custody on the basis that Children were bonded to Mother, but asserts that "[t]here is no factor

relating to the bond between [the] parent and child." ***Id.*** He also claims that any bond Children have with Mother could have been maintained with Mother's receiving partial physical custody. ***Id.*** at 16.

To support his argument, Father relies on ***W.C.F. v. M.G.***, 115 A.3d 323 (Pa. Super. 2015). In that case, despite multiple findings that pointed to an award of primary physical custody to the father, the trial court awarded the mother primary physical custody and the father partial physical custody. ***Id.*** at 324. In doing so, the trial court ascertained that — while the factual findings favored the father more than the mother — because the father had not been the primary custodian to date, "a change in primary custody would be disruptive for the child, particularly because it would mean placement in child care rather than with a family member during the week." ***Id.*** at 329-30 (emphasis and citation omitted).

After the father appealed, we vacated the trial court's order, concluding that the trial court's "determination that [the m]other be awarded primary physical custody is unreasonable in light of its own factual findings which are amply supported in the record." ***Id.*** at 324 (citation omitted). We elaborated that, "[w]here a court makes findings consistently in favor of custody in one party, and then awards custody to the other party, it must provide valid reasoning to support that decision." ***Id.*** at 331. We determined that the trial court's reasoning did not justify its decision, where "the fact that [the f]ather has not been [the] primary custodian to date is, first, a function of [the m]other's unilateral unreasonable decisions, and second, not a basis for

denying him primary custody where all factors point otherwise." ***Id.*** at 330. We also noted that "[c]hanges in custody schedules will invariably disrupt a child's routine[,]" and observed that the trial court had specifically found that the father could obtain appropriate child care and that such child care would benefit the child's social development. ***Id.*** at 330, 331.

In addition, in ***W.C.F.***, we pointed out that the trial court had found that mother attempted to alienate the child from the father, allowed the maternal grandmother to exert a negative influence, refused to cooperate with the father, and had made repeated allegations of abuse against the father that were determined to be incredible by the trial court. ***Id.*** at 331-32. All of these factors, we said, "would outweigh retaining primary custody with [the m]other absent a compelling rationale evidenced by the trial court." ***Id.*** at 332. Thus, we ultimately opined that, "[a]lthough the court's findings are supported in the record, its conclusions are unreasonable in light of these findings. Because the majority of the statutory best interest factors favor [the f]ather, we conclude that the court's order was not based on a reasoned consideration of those factors." ***Id.*** at 331. We therefore vacated the trial court's order and remanded for entry of an order consistent with the trial court's findings and this Court's decision. ***Id.*** at 332.

We reach the same conclusion here; that is, the trial court's conclusions are unreasonable in light of its factual findings. The trial court found that the custody factors either weighed in favor of Father or were neutral; none of the factors weighed in favor of Mother. ***See*** N.T., 12/10/21, at 8 (the trial court's

indicating that "the majority of the factors favor Father"). In addition, the trial court determined that Mother is hostile towards Father even in the presence of Children, and that this hostility has already negatively impacted Children. Order, 12/16/21, at 1. The trial court likewise ascertained that Mother's "behavior has been significantly detrimental to [H.W.], who is now in need of professional help." **Id.**; **see also** N.T., 12/10/21, at 8 (the trial court's opining that "Mother's behavior towards Father is detrimental to … [C]hildren"). Nevertheless, the trial court found that Children are bonded to Mother and that she should be given an opportunity to correct her behaviors. Order, 12/16/21, at 1.

While we recognize the importance of maintaining the parent-child bond and extending second chances, we do not deem this rationale compelling enough to justify the trial court's decision, where the statutory factors strongly point to Father's receiving primary physical custody of Children. **See W.C.F.**, 115 A.3d at 332 ("While prudence dictates that this Court exercise its authority sparingly in a child custody case, we are not powerless to rectify a manifestly unreasonable custody order."). Most children are bonded to their parents, but such bonds cannot cause us to blatantly ignore what is in the best interests of the child, particularly where a parent's behavior has been deemed detrimental to a child. As we set forth above, "[t]he **primary focus** in any custody case is the best interests of the child. The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and

spiritual well-being." ***C.M.***, 215 A.3d at 591 (cleaned up; emphasis added); ***see also id.*** (stating that "the ***paramount concern*** of the trial court is the best interest of the child") (citation omitted; emphasis added). Further, as Father discerns, Children's bond with Mother can be supported by her receiving partial physical custody of them. As far as giving Mother a chance to redeem herself, if she follows through with correcting her behavior, she can always seek modification of the custody order in the future. ***Cf. W.C.F.***, 115 A.3d at 331 ("[D]ue to the lack of cooperation [by the mother] cited by the trial court, awarding primary physical custody to [the] father might be of significant benefit to [the c]hild at this time, and might make [the] mother realize that her lack of cooperation and attempts at alienation will not be rewarded by this Court.").

Accordingly, we vacate the trial court's order to the extent it awarded Mother physical custody of A.W., M.W., and J.W., on a week-on/week-off basis, and remand for the trial court to fashion an order giving Father primary physical custody of them, with Mother receiving partial physical custody. Furthermore, with respect to H.W., Mother shall continue to have sole physical custody of H.W. until such time as his counselor evaluates his behavioral health and issues a report recommending a time schedule and steps for restarting Father's custodial time with H.W., with the intent being that H.W. will eventually be on the same schedule as the other Children.

Order vacated.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/23/2022